**McNICHOLS et al. v. INTERNATIONAL TYPOGRAPHICAL UNION et al.**

**HOWARD v. WEISSMANN et al.**

Circuit Court of Appeals, Seventh Circuit.
September 24, 1927.

Rehearing Denied October 19, 1927.

No. 3864.

1. **Courts ⚖️323 — Evidence held to warrant finding diversity of citizenship existed to give federal District Court jurisdiction.**

Evidence as to residence of one of defendants *held* to warrant finding that necessary diversity of citizenship existed to give federal District Court jurisdiction.

2. **Courts ⚖️330—Finding that amount in controversy in suit to enjoin union from submitting to members proposed amendments to constitution exceeded amount necessary to give federal court jurisdiction held sustained by evidence.**

In suit to restrain international union and certain officers thereof from submitting to vote

21 F.(2d)—32

of members proposed amendments to its constitution, finding that amount in controversy exceeds $3,000, as alleged in complaint, for purpose of federal court's jurisdiction, *held* warranted by fact that value of union's old age pension is $416 annually, that right to be admitted to union home is substantial, and that liquid assets of union amount to $5,000,000.

3. **Trade unions ⚖️3—President's submission to subordinate unions of proposed amendments to constitution, in defiance of vote of other members of executive council, held void.**

Where international union's constitution provided that executive council, consisting of president, several vice presidents, and secretary treasurer, should have general supervision of the business of the union and of its subordinate unions, and that, whenever 150 subordinate unions petition executive council for submission of any proposition or amendment, the indorsements of such petition having been secured within three months, the proposition or amendment shall be submitted to the membership within three months, *held* that president had no authority to submit such amendments to local unions in defiance of vote of other members of the executive council, and his action in doing so was illegal and void.

Appeal from the District Court of the United States for the District of Indiana.

Suit by James P. McNichols and others against the International Typographical Union and others. From an order granting a temporary injunction, Charles P. Howard, individually, and as president of said union and member of its executive council, appeals. Affirmed.

This appeal is from an order granting a temporary injunction, restraining the International Typographical Union, an unincorporated association, and hereinafter called the union, and certain officers thereof, from submitting to the members of the union, proposed amendments to its constitution.

The proposed amendments were:

"Article V—Officers and Elections.

"Section 1. The elective officers of the International Typographical Union shall be a president, a first vice president, a second vice president, a secretary treasurer, each of whom shall be elected by the votes of printer members exclusively; a third vice president who shall be a member of the Mailers' Trade District Union elected by the votes of mailer members exclusively; a board of auditors consisting of three members, such number of delegates to the American Federation of Labor as this body is entitled to by law; one delegate to the Canadian Trades and Labor Congress (who must be a member of one of the Canadian unions), such number of nominees as may be necessary to fill vacancies in the membership of the Union Printers' Home Corporation, and an agent of the Union Printers' Home."

"Section 3. Trade districts union's under the jurisdiction of this union shall be entitled to representation in conventions of the International Typographical Union upon the same basis as if such trade district union was a subordinate union of the International Typographical Union, and local unions of trade district unions shall not be entitled to delegates in conventions of the I. T. U."

The union has existed for many years, and its members are either printers or individuals connected with allied crafts. One of these allied crafts was called "mailers." There are, in all, about 800 local unions with a membership of 70,000 printers and 3,000 mailers.

Among the rights incident to membership are (a) participation in a mortuary benefit; (b) old age pension; (c) eligibility to Union Printers' Home; (d) participation in the election of officers of the union.

The liquid assets of the union aggregate $5,000,000 while the real estate is valued at $200,000.

The proposed amendment would lessen the influence of those members called the "mailers." A determination of the controversy necessitates a construction of certain sections of the constitution which will later be set forth verbatim. Appellant Howard, as president, sought to submit these amendments to the various local unions for approval. They had been indorsed by 150 subordinate unions. A protest against their submission was filed with the executive council. At a meeting held for the purpose of acting on the petition and the protest, a motion was made by one of the executive council to sustain the protest and declare the proposed amendment unconstitutional. Appellant Howard, as president, ruled the motion out of order. An appeal was taken from the chair's ruling, but Howard refused to submit this appeal to a vote. An effort was then made to place in the president's chair one of the other members of the executive council, but Howard refused to surrender the chair. Thereupon four of the five members of the executive council recorded their votes against the president's ruling and in favor of such action as would declare the amendments unconstitutional.

Notwithstanding this action on the part of the Executive Council, President Howard proceeded with the referendum. This suit was then instituted.

Robert N. Golding, of Chicago, Ill., for appellant.

Frank C. Dailey, of Indianapolis, Ind., for appellees.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

EVANS, Circuit Judge (after stating the facts as above). Appellant attacks the order appealed from on two grounds: First, because the court was without jurisdiction. Second, because the court's construction of the union's constitution and by-laws was erroneous.

Objection to the court's jurisdiction was predicated upon the alleged failure of plaintiff to show the amount in controversy exceeded $3,000. It was also contended that the necessary diversity of citizenship of the parties was lacking.

[1] The record does not support appellant in either contention. The necessary diversity of citizenship depended upon the citizenship status of one Seth R. Brown, a party defendant. He testified:

"I have lived in Indianapolis since the 1st day of November, 1924." (Suit was brought the 8th day of December, 1926.) "My home preceding that time was for about 14 years in Los Angeles. My home now is in Indianapolis. I am here by virtue of the law of the International Typographical Union. I must make my official residence in Indiana. I have not voted here. My family is here. I did not come here to make my home here or with the intention of remaining here. I came for just a temporary residence for the purpose of carrying on my duties as an officer of the union. My entire family lives in Indianapolis. I keep house here, and this is the only home I have. I consider that this is my residence and home now, although I am not sure whether I am going to maintain it as my home after my term of office has expired. It is the only home I have at this time. At the expiration of my term of office, I may like Indianapolis so well I will stay here."

Upon this evidence, the trial court was justified in finding Brown a citizen of Indiana.

[2] A finding that the amount in controversy exceeded $3,000 is supported by the fact that the old age pension is worth $416 annually, while the value of the right to be admitted to the Union Printers' Home is substantial. Likewise, the right to vote for officers of the union and to protect a member's interest in the $5,000,000 of liquid assets are factors of consequence. Nixon v. Herndon, 273 U. S. 536, 47 S. Ct. 446, 71 L. Ed. 759; Giles v. Harris, 189 U. S. 475, 23 S. Ct. 639, 47 L. Ed. 909; Wiley v. Sinkler, 179 U. S. 58, 21 S. Ct. 17, 45 L. Ed. 84.

In view of what has been said by this court in Operator's Piano Co. v. First Wisconsin Trust Co. (C. C. A.) 283 F. 904, and in Central Commercial Co. v. Jones-Dusenbery Co. (C. C. A.) 251 F. 13, further dis-

cussion seems unnecessary. The court was justified in accepting plaintiff's allegation that the amount in controversy exceeded $3,000.

[3] This brings us to appellant's second contention, to dispose of which it becomes necessary to study the various provisions of the union's constitution. Sections which are deemed pertinent are herewith quoted.

#### "Article II.—Laws.

"Section 1. The International Typographical Union may enact and enforce laws for its government and that of subordinate unions and members thereof throughout its jurisdiction.

"Section 2. The laws of the International Typographical Union shall be comprised in:

"(a) The Constitution, which shall contain the outline, fundamental principles and policies of the organization, the jurisdiction of the International Typographical Union and local unions, the list of officers and their general duties and salaries, and all matters pertaining to the raising of revenue.

"(b) The by-laws, which shall contain laws relating to the qualification and election of officers and their specific duties, the election of delegates, and the auditing of International accounts.

"(c) The general laws, which shall contain all matters pertaining to the relations of members and local unions to each other, and to employers and others outside the jurisdiction of the union.

"(d) The convention laws, which shall contain all laws, rules of order, committees, etc., relative to the convention and its deliberations.

"(e) Laws instituting and relating to a system of benefits and laws providing for the care of invalid and aged and infirm members in good standing.

"Section 3. The Constitution shall only be amended by referendum vote, in the manner hereinafter set forth.

"Section 4. By-laws and general laws may be enacted by the conventions of the International Typographical Union, but shall in nowise conflict with the Constitution, or any part thereof."

#### "Article III.—Conventions.

"Section 1. The conventions of the International Typographical Union shall be held annually on the second Monday in August at such place as the delegates in convention assembled may designate. All the arrangements for the same to be made by and at the expense of the International Typographical Union; provided, the convention for the year 1926 shall be held on the second Monday in September."

#### "Article VI.—Duties of Officers.

#### "The Executive Council.

"Section 7. There shall be an executive council, consisting of the president, the first vice president, the second vice president, the third vice president and the secretary treasurer, which body shall have general supervision of the business of the International Union and of subordinate unions. Whenever any business concerning the Typographia is to be considered, the fourth vice president shall also be considered as a member of the executive council."

#### "Article XI.—Appeals.

"Section 1. All appeals from the decision of a subordinate union shall be submitted, in written or printed form only, to the executive council of the International Typographical Union (one copy of complete papers to be furnished the executive council; both appellant and respondent must retain complete copies to be used in case of appeals to convention), and decision rendered by that body, except in cases where allied crafts are organized as trade district unions. Should either party feel aggrieved at the decision of the executive council, he shall have the right of appeal, in printed form only, to the succeeding convention of the International Typographical Union, which judgment shall be final.

"Section 2. Appellant and respondent shall furnish copies of papers in complete form to each other, and shall be entitled to submit replies to these original articles. In appeals to the convention, the same procedure shall be followed."

#### "Article XVII.—Amendments.

"Section 1. Amendments to this constitution shall be submitted to the convention of the International Union, and such amendments as are favorably acted upon by said convention shall be referred to subordinate unions, and by the subordinate unions to the membership at large. Subordinate unions shall then discuss the proposed amendments, and at a date which shall be designated by the executive council, but which must be within three months from the adjournment of the convention, the proposed amendments shall be voted upon by the members of subordinate unions, and the vote in detail forwarded under seal, to the secretary treasurer of the International Typographical Union,

within ten days after the date set by the executive council for the taking of said vote, when the International president and secretary treasurer, and one member of the local union, who shall be selected by the president of this body, shall canvass the vote and declare the result to the craft, and should a majority of the votes cast be in favor of the amendment it shall go into effect on the date fixed in section 4 of this article.

"Section 2. The convention of the International Typographical Union shall have power to enact by-laws and general laws for the government of the craft, but all laws involving an increased taxation shall be submitted to a referendum vote.

"Section 3. Whenever one hundred and fifty subordinate unions shall petition the executive council for the submission of any proposition or amendment, the indorsements of such petition having been secured within three months, the proposition or amendment shall be submitted to the membership within three months of the receipt by the required number of petitions, and the vote taken and canvassed in the same manner as amendments and propositions referred to the membership by the convention of the International Typographical Union. Propositions submitted to subordinate unions for indorsement or to the membership for adoption as herein provided, must be drafted in proper form and shall include all sections or articles amended or repealed by such proposition. Laws or parts of laws to be repealed shall be placed in brackets, and amendments to existing laws and new laws shall be printed in boldface type; provided, the executive council may submit to referendum vote propositions which require immediate action without petition of local unions. All such propositions and amendments shall be published to the craft a reasonable time before the vote thereon.

"Section 4. All new laws and resolutions adopted by the membership of the International Typographical Union, unless otherwise provided, shall be in force and effect sixty days after the canvass of the vote on the same.

"Section 5. The by-laws and general laws adopted by the convention of the International Typographical Union shall go into effect at the same time as laws and amendments submitted to the membership by the same convention."

The quoted provisions of the constitution do not leave the question at issue entirely free from doubt. The use of the word "shall," in section 3 of article 17, cannot be ignored. In fact, but for section 1 of this article and section 7 of article 6, it would seem that the executive council had no discretion in the matter.

After considering all of the provisions above quoted, however, we are convinced that they may be, and should be, reconciled and each given effect. This can be accomplished by giving due recognition to the powers and duties of the executive council. Among other things, section 7 of article 6, which deal with "Duties of Officers," provides that the executive council "shall have general supervision of the business of the International Union and of subordinate unions." From the very nature of this organization, the executive council is a body of extensive power and authority. This provision, as well as those found in sections 1 and 3 of article 17, necessitate the conclusion that the submission of any proposed amendment must be by the executive council.

But what shall be submitted? Anything proposed by 150 unions? Obviously not. Only "any *provision or amendment,* the indorsement of such *petition* having been secured within three months," shall be submitted.

Who determines whether the proposal comes within the language above quoted? Of necessity, the executive council. Assuming, in view of the title to article 17, the words "proposal," "amendment," and "petition," are used synonymously, and are intended to mean merely a proposed amendment, could it be successfully argued that, if there was a difference of opinion among the executive council as to the date when certain indorsements were made, the president of the executive council could act alone or could override the other members and assert a date contrary to the fact or contrary to the best judgment of his four associates? Obviously not. If there was a question as to the number of indorsements received, and four of the executive council believed that 140 instead of 150 indorsements had been seasonably made, could it be urged that the president of the council might find the number to be 150 and thereupon act in defiance of, and against the votes of, the other four? Nowhere is the president, under article 6, given any such power or authority. True, for dereliction of duty, he may suspend an officer. But, under article 7 he is only one of five members of the executive council. This executive council can only act as a body, and, inasmuch as the submission of amendments to the constitution must be made by the executive council, there can be no lawful submission unless the executive council, *as a body,* so directs. Upon the undisputed evi-

dence before us, there was no action by the executive council. Four of the five members registered their votes as opposed to such a submission. In the face of this record, the action of the president in attempting to submit the amendments was unauthorized and illegal.

Situations may be conceived where the duty of the executive council is so clear and so plain that mandamus would lie to compel action. But even in such a case the president could not assume to act as, and for, the executive council.

We conclude, therefore, that all proposed amendments of the constitution of the union, instituted under section 3 of article 1, must be submitted to the local unions by the executive council; that the president is but a member of the executive council and has no authority by virtue of his office to submit such amendments to the local unions; that his action in attempting to submit the proposed amendment in defiance of the vote of the other four members of the executive council was illegal and void. The order is affirmed.