## HOWARD et al. v. WEISSMANN et al.

Circuit Court of Appeals, Seventh Circuit.
January 26, 1929.

Rehearing Denied April 18, 1929.

No. 4019.

Robt. N. Golding, of Chicago, Ill., for appellants.

Wm. H. Thompson, of Indianapolis, Ind., for appellees.

Before ALSCHULER and ANDERSON, Circuit Judges, and GEIGER, District Judge.

GEIGER, District Judge. This is an appeal from a decree awarding an injunction against the appellant typographical union and its officers restraining them from (1) enforcing certain amendments to the constitution which, if effective at all, abolish "Trade District Unions" (to be later described); (2) enforcing demands made upon a "Trade District Union" for the payment of fees and expenses incurred by the appellant typographical union in this lawsuit; (3) proceeding with attempts to further amend the constitution of the appellant union in particulars to be noted.

It may be said, preliminarily, that the first of the foregoing is of dominant importance in the suit; that its consideration necessitates some extended reference to the facts appearing in the record, to ascertain whether the decree has a basis—in point of fact—requisite to enable the trial court to apply, favorably to plaintiffs' claim, principles which deal with rights asserted to arise out of membership in voluntary organizations such as are before the court. Further, that, broadly speaking—the applicable principles are really not seriously controverted by the parties —the question is: Do the facts disclose a case for equitable intervention?

The bill was originally filed by McNichols, Weissmann, Carr, and others against the present appellants, the International Typographical Union and Charles P. Howard individually, and as president of said union, with whom were joined defendants Brown, Hewson, Smith, and Hays, each in his individual capacity and, representatively, as an official of said union. The bill, alleging jurisdictional and also "class suit" facts, the official and membership relationship of the individual parties respectively to the defendant typographical union, characterized the latter as "an international organization of men and women engaged in the business of printing, and is composed of men and women who are engaged in two branches of the printing industry, to wit, printers and mailers"; and further, in substance, that it was organized more than 30 years ago, its membership being composed of printers and workers in "allied trades"; that all "allied" craftsmen have been eliminated from the union, except "mailers," the membership now consisting of approximately 70,000 "printers," and 3,000 "mailers."

The bill averred the good standing of plaintiffs as "mailer" members of the union, their long-continued contribution of dues, assessments, and the like, the union's accumulation of a large fund and property, the interest therein of plaintiffs and other members similarly situated; the defendant Howard and printer members had determined to "eliminate" the mailer members from the union and to deprive them of their beneficial interest in the funds thus accumulated and from the enjoyment of other benefits incident to membership. This object or determination, so it was in substance averred, was to be accomplished through proposed amendments to the constitution of the union about to be submitted to a referendum vote of the membership. Such proposed amendments were set forth; and their validity was challenged because discriminatory, and their effectiveness to impair rights in accumulated property. In addition thereto, the bill specifically challenged the procedure adopted by the union officials, in that there was a failure and refusal to permit an "Executive Council" to act upon the proposition of submission of said amendments to a referendum vote—contrary to the fundamental law of the union.

Upon a hearing before the District Court, this last-noted challenge was upheld and a restraining decree then entered was reviewed and upheld by this court on September 24, 1927. McNichols et al. v. International Typographical Union, 21 F.(2d) 497. The reported decision suffices to show the narrow issue determined. The remission of the cause upon the affirmed decree obviously left questions respecting the effectiveness of proposed amendments, if and when adopted, undetermined either in trial or appellate court. On October 22, 1927, plaintiffs filed in the District Court a supplemental bill, which, reiterating the purpose and determination of the then defendants to eliminate complainants from the union and to deprive them of benefits in said organization, averred the taking of further steps toward its accomplishment since the original hearing in the District Court and during the pendency of the cause on appeal. Such steps are recited at length in the supplemental bill. Upon joinder of issue the case was tried, and the court awarded to complainants the decree now here for review. While, as has been observed, the dominant phase of the present decree deals with the restraint of enforcement of amendments to the constitution of the union, there is now no question respecting the regularity of procedure.

It is believed that the case may be developed upon its facts by reference to the constitution of the appellant typographical union, in its particular provisions respecting the formation, and the powers of the other organizations now in existence and in relationship to each other and to the appellant typographical union; and in which, as well as in appellant union, the plaintiffs in this suit—appellees here—have membership; and out of which have arisen and now exist the rights which they assert cannot be withdrawn, destroyed, or substantially disparaged or impaired by "dissolution" or "abolition" of the organizations which have a relationship; also, so it is claimed, in which membership is thus conditioned.

Assuming, as we may, that in the "printing" business employés may broadly be regarded as a craft, yet for many years here, as in most industries, classification of "allied" crafts within the industry has been recognized and acted upon; and while the appellant typographical union has asserted its jurisdiction to "include all branches of the printing and kindred trades other than those over which jurisdiction has been conceded by agreement," its own present membership comprises "printers" and "mailers" as two of a considerable number of "allied crafts" of the industry. For present purposes, it suffices to note that the proofs deal with three organizations: (1) The appellant, International Typographical Union of America; (2) Mailers' Trade District Union; and (3) local unions consisting of printers, or mailers, or, in some instances, both.

Since January 1, 1902, the constitution of the appellant typographical union has contained this article:

"XIII.

"Section 1. Any of the allied trades under the jurisdiction of this organization may form a Trade District Union.

"Section 2. Such Trade District Union shall have the following powers, privileges and rights, and as may be more specifically set forth in the By-Laws;

"(a) To charter, establish and form unions of its craft. Charters to be procured from the International Typographical Union.

"(b) To issue and control traveling cards to members working at its craft.

"(c) To make all laws for the sole government of its craft.

"(d) To decide all matters in dispute solely affecting members of its union.

"(e) To elect officers of the Trade District Union, the President of which shall be a Vice-President of the International Typographical Union.

"(f) To collect and forward to the Secretary-Treasurer of the International Typographical Union all per capita tax due from subordinate unions of its craft.

"Section 3. Such powers, privileges and rights shall not work to repeal or affect the laws of the International Typographical Union regarding revenue, per capita tax, benefits, strikes and lockouts, the six-day law, and allied trades council laws."

What the precise situation was prior to the adoption of this article, i. e., with reference to "district" unions analogous to trade district unions, their powers, conditions of membership, or relationship to the appellant union, is not disclosed in the record. The "Trade District Union" whose dissolution is now sought by appellant, as will be noted, came into existence after the adoption of the foregoing article. But, a conception of the status of these different organizations, of membership therein respectively, of their spheres of activity in the "craft," of the dignity of their relationship to each other, regardless of origin (whether by delegation or grant or by reservation), is disclosed by the witnesses at the trial; and it pertinently bears upon the fundamental question.

The witness John W. White testified:

"I live in Indianapolis, and am forty-two years old. I am now, and have been for the last twenty-eight years, which includes the apprenticeship period, a newspaper mailer. I am now, and have been for the last twenty years, continuously employed in the mailing department of the Indianapolis Star. I am now and for twenty-four years have been a member of the Mailers' Trade District Union, and am now its Vice-President. I am also and have been for twenty-four years a member of the International Typographical Union. The Mailers' Trade District Union has been organized twenty-five years, and when I came into membership I came into both of them at the same time. My membership in the Mailers' Trade District Union automatically made me a member of the International Typographical Union. I carry two membership cards, one in the International Typographical Union and one in the Mailers' Trade District Union. I have a membership in the International Typographical Union and a distinct membership in the Mailers' Trade District Union. The number of my local Mailers' Union is No. 10, which was formed in August, 1902. I became a member in 1903. Article XIII of the constitution of the International Typographical Union has been the same from 1902 to 1926, inclusive.

"The Mailers' Trade District Union is an organization of, for and by mailers. They have no connection, nothing to do with anything, but the mailing business. We have an organization perfect within itself of an executive council, composed of the president, vice-president, secretary-treasurer, and we hold our conventions and adopt our laws. The Mailers' Trade District Union at the present time is composed of approximately fifty-four Mailers' Unions. Each local union has its officers, but there is only one Trade District Union. They hold their conventions and make their laws, which apply only to mailers and only govern the mailing trade, and they are the only provisions now in force or in view, and there is nothing else that covers the mailing business. The definition of the preamble of the Mailers' Trade District Union constitution is accepted by both employers and mailers as the work defined in the mailing trade. There is absolutely no other law or book of the Mailers' Trade District Union that covers that.

"The Mailers' Trade District Union has an income of $3,750 every month, or $45,000 every year. This is collected by the mailers, spent by the mailers and for the mailers only. It does not go into the Typographical Union treasury. This money is spent for mailers alone in helping to organize unions, in helping them with scales, in helping them in any kind of trouble they may be in. Each individual mailer pays into the Mailers' Trade District Union $1.25 per month. Each individual also pays into the Typographical Union a capita tax of 70 cents a month, and the old age and mortuary funds of one per cent. of their total earnings. These amounts are paid into the International Typographical Union, and are separate and distinct from what is paid into the Mailers' Trade District Union treasury. We pay that to our local union, which pays it in. It is essential that we pay that in order to belong to the Mailers' Union. During the time the Mailers' Trade District Union has been in existence about $300,000 has been raised from mailers alone to spend for the betterment of the mailers' working conditions, and that was used, among other things, for the organization of local unions. The International Typographical Union provides a strike benefit but it is not enough for men to live on, and we, in matters when it is necessary, supplement those strike benefits with money out of the treasury of the Mailers' Trade District Union.

"Mailers pay to the International Typographical Union the same percentage of dues as is paid by the printer members of the In-

ternational Typographical Union. Printers pay no dues into the Mailers' Union. This has been true from 1902 until the present time. The mailers have a fund of their own, which at this time is approximately $12,000. We have a national convention each year which has been held about three days before the International Typographical Union convention. The International Typographical Union divide their assets into the Home, and other assets, and I believe they have approximately five million dollars in the general treasury and the several benefit features, and three million dollars in the Home corporation at Colorado Springs, making total assets of around eight million dollars. The Home is a home for members of the International Typographical Union after they are disabled because of age or sickness. There are mortuary and pension funds. During all the years of membership of the mailers in the International Typographical Union they have paid into each of the funds as long as they have been created. They have paid the same amount that the printers pay. I, personally, have paid per capita tax into the International Typographical Union for twenty-four years, and have paid into the other funds every year since they have been established. There have twice been extra ten per cent. assessments on mailer and printer members of the International Union, that is, ten per cent. of the wages. One occasion was the eight hour strike in 1906. The assessment was gradually reduced and finally cut off. I remember that the mailers paid in over $75,000 and didn't draw out a cent. About 1921, during the forty-four hour strike, there was a ten per cent. assessment which was carried on for a year or two and gradually diminished until it was finally wiped out. Into that fund the mailers left a balance over what they drew out of something around $400,000. We have had actuaries work on the amount the mailers have paid into the International Typographical Union, and to the best of our knowledge the amount we paid in, over what we have drawn out in benefits and everything, approximates one million dollars."

The record contains the constitutions, the by-laws, or general laws both of the appellant typographical union and the Mailers' Trade District Union; and discloses the latter's relationship to local unions of mailer craftsmen. It shows the inter-relationship of these three, respectively, the degree to which any one may be subordinate, independent, or autonomous. The importance of these laws and regulations is conceived to reside in their effect to give to the several organizations and to concurrent membership therein, by persons circumstanced as are the appellees, a status or condition. And, as will be noted, if such status is intended and has been recognized as such, then none of the parties to this action should be heard to assert that attendant rights in no event may be found within the realm of judicial protection. Now a careful reading of these organic laws lends strong support to the claims made by the witness White in his efforts to picture the status and the relationship of these unions and their concurring membership to each other; and appellant Howard, the president of appellant union, in the convention which was considering amendments to the constitution, addressed himself pertinently to the particular matter of the status or relationship of the appellant typographical union and the Mailers' Trade District Union and their respective members. He said:

"The only affiliation the mailers have is on the basis of the Trade District Union. No individual member of the Mailers' Union other than as they apply to voting and beneficiary features is affiliated with the International Typographical Union. They collect dues from our members not as subordinate unions, but as Trade District Unions. They have their own president, their own Executive Council, and appeals go to the Executive Council of the Mailers' Trade District Union and do not come to the Executive Council of the International Typographical Union."

Again:

"The constitutional provision is plain that neither local mailers' unions nor individual members of mailers' unions have the right of appeal to the Executive Council upon any question. For this reason it must be assumed they were representatives of the Mailers' Trade District Union. Subordinate unions of mailers have no standing except as a part of the Mailers' Trade District Union. Outside of their right to vote for our officers and send delegates to our conventions, they have no connection with the International Union as local unions. Disputes are decided by their own Executive Council or by conventions of the Mailers' Trade District Union and are not appealable to this convention because of the operation of the section of the constitution I have quoted to you. I say again if there were any doubt about a controversy of this kind being appealable, certainly under that provision of the constitution, nobody can hold that controversies involving members of a mailers' union are appealable to the Executive Council of the International Typographical Union."

The complaint is directed specifically to the action of the appellant union in amending its constitution by striking out all of article XIII heretofore quoted, and portions of other articles, to effectuate the purpose—expressly declared in a resolution of submission to a vote—viz., "to dissolve (such) Trade District Unions and to prevent future organization or functioning of Trade District Unions by striking out such provisions of the Constitution as authorize the organization of Trade District Unions." Respecting the effectiveness of the amendments to accomplish the result there can be no doubt. True, as suggested by appellants, a mailers' trade district union might be organized and exist, but not within the contemplation of the hitherto relationship to the appellant union, nor, as it seems to us, in any sense which involves exercise of powers heretofore possessed by "mailers" who are identical members of the appellant union. It is hardly conceivable that "mailer" members of the appellant union, subject to its future absolute jurisdiction (if it should assume to exercise it), e. g., to form unions of the "mailer" craft, "to make all laws for the sole government" of such "craft," to decide all matters in dispute solely affecting members of the union—these are the powers which under Section 13 are possessed by the Mailers' Trade District Union—could at the same time be subject to the exercise of these same powers by another union in no relationship to the appellant union. And the circumstance, if it is to be noted, that the power of the Mailers' Trade District Union to "charter, establish and form unions of its craft" is coupled with the issuance or procurement of "charters" by or from the appellant typographical union, is of no relevancy in determining the quality or substantive character of powers which trade district unions thus possess under the article in question; nor does it support the right of the appellant union to destroy or disparage the status of the mailer members who accept the grant—really, a grant of substantial autonomy.

The amendments now under consideration were inaugurated before a convention of the appellant union by resolutions which are referred to in this case as "proposition 120"; and appellees—so appellants quote from a brief filed—have stated the issue thus:

"We make no claim that proposition 120 was not adopted in accordance with the prescribed form contained in the Constitution. What we do say is that the amendment is illegal and void and that inasmuch as it affects property rights, a Court of Equity may en-join its enforcement. We concede that Courts are without authority to interfere with the purely internal affairs of voluntary unincorporated associations not affecting property, constitutional or other vested rights."

And appellants, apparently in acquiescence, comment:

"Thus the question is one of fact—Does proposition 120 adversely affect any *vested* right?"

Manifestly, it might prove fruitless or futile, in discussing this case, to take up seriatim so-called "rights" of members of any or all of these organizations with a view of determining whether singly or in the aggregate they are comprehended within the term "vested." Probably all will agree that the right of participation or interest in a benefit or gratuity fund—no matter how characterized—is susceptible of enforcement and protection. If the case disclosed merely an effort at regulation or legislation over such a subject-matter, which affected equally all membership and without attempting to withdraw, "dissolve," or interdict other "rights" for a long time possessed and exercised under constitutional recognition, and having a clear relationship to such "property" benefits, it might readily be concluded that the attempted act withstood the test of reasonableness in that no substantial impairment resulted. But when, as here, it clearly appears that from earliest times what may be called a "craft autonomy" not only attended, but in a true sense conditioned membership in the trade district union, in local mailers' unions and in the appellant union, the court, in answering the question of fact, need not ascribe to that phase of the matter less importance or less dignity than the parties ascribe to it. Plainly, the broad "jurisdiction" asserted by appellant is futile against a "craft" (such as mailers) except as assent is obtained. And when, as here shown, power characterized in some instances as "sole" by the membership of a craft is possessed (either by grant, cession, or reservation), it qualifies the asserted broad "jurisdiction." It becomes a condition or a consideration of the relationship whether the organization be viewed as affiliated, federated, or otherwise. The recognition of long-continued independence of right to act with reference to matters which otherwise might have been vested and exercised within the power of another body is persuasive in establishing the value and importance of the right. Therefore, as has been observed, the court need not determine the value of this right and decree it to be "vested" in the sense of money or tangible property. It suffices

that the parties, the appellant union on the one hand and its mailer craft members on the other, have deemed it advisable to comprehend it in a constitutional stipulation unquestionably designed to assure its possession and exercise in and by the latter through the medium of a trade district union. The latter, in its relationship to "mailers" who may be members both of local and appellant unions, has been and is the means and condition of effectuating a substantial autonomy, which again is the basis upon which mailers have discharged obligations of membership in each of the unions. And we conceive it to be no answer to appellees' contentions respecting the character and value of this autonomy to suggest that appellant may accord an unquestionable equivalent. As we interpret the appellant's constitution, the declaration that its "jurisdiction shall include all branches of the printing and kindred trades," in the very nature of things, cannot establish jurisdiction, cannot bring recognition of power by the members of the trade or any craft therein, without assent or some act of membership. Rather is this a mere statement of field of operations; and this is emphasized by the express limitation of description, viz., "other than those over which jurisdiction has been canceled (conceded) by agreement." Plainly, the constitution of appellant union is aimed to provide not only means for acquisition of jurisdiction over "allied" crafts within the industry, but limitations on power if and when any jurisdiction (through assent of members) is obtained. We believe that to be the intendment and effect of article XIII, that is, it establishes a well-defined autonomy of craftsmen. When, therefore, the autonomous powers are so possessed and enjoyed, it makes little difference whether they came by grant or by reservation, because—as against appellant—they constitute the basis of assent to what in effect is a limited jurisdiction. It should not be said that there was also an assent to a larger jurisdiction or that the 25 years' recognition of substantial autonomy on the faith of which most of the present mailers' unions came into being was permissive only; that it was at the peril of having the limited assent to appellant union's "jurisdiction" compulsorily enlarged.

The establishment of the Mailers' Trade District Union under article XIII, and the possession of the powers comprehended within said article, and the formation of unions on the faith thereof, seem never to have been regarded as merely provisional, so that continued existence of the organizations formed and

the enjoyment of the rights possessed thereunder might depend wholly upon majorities of another craft, in this case "printers"; or that assent or nonassent of the particular craft, "mailers," was of no moment. The appellees are in good position to claim rightfully that the conditions were in truth appurtenant to membership and not subject to be withdrawn at the will of those who did not and do not, as an allied craft, possess, or at least independently exercise, the rights and powers comprehended within that article. In other words, the autonomous possession and exercise of rights and powers during a period of 25 years, supposedly, at least, under constitutional security, by a particular class of the membership, can hardly be characterized as a purely internal affair of a voluntary association. And when, as it appears, the enjoyment of the rights has been attended by financial contributions in each of the two organizations which have resulted in an accumulation required to be held for present and future benefit of the contributors, the "rights" may, without difficulty, respond to the definitions, "vested" or "property."

We are satisfied that the District Court was justified in giving an affirmative answer to the question of fact which the case presents, and thereby furnishing a basis for restraining enforcement of the amendments.

■ The other aspects of the decree need brief consideration only. Upon affirmance of the interlocutory decree, the appellant union, feeling aggrieved at appellees' resort to judicial process, and avowing that the controversy was within its own power of determination, formally resolved:

"That the Mailers' Trade District Union be and is hereby ordered to pay to the secretary-treasurer of the International Typographical Union such sum of money as is necessary to reimburse the International Typographical Union for all attorneys' fees and costs for which the International Typographical Union is now or may hereafter become liable in connection with this action;" and

"That upon failure to reimburse the International Typographical Union the Mailers' Trade District Union shall be declared delinquent as provided in section 1, article X, constitution;" and

"That the actions of the representatives of the Mailers' Trade District Union in appealing to the courts were unjustified and unnecessary, and the actions of Vice-Presidents Brown, Hewson, Smith and Secretary-Treasurer Hays are hereby declared to have been illegal, indefensible and in violation of the

constitution in attempting to interfere with the right of subordinate unions to initiate amendments to the constitution."

The constitutional provision (section 1, article X) prescribes suspension of charter for failure or refusal of a subordinate union to pay a per capita tax and "other moneys."

Whether the appellant union has any power to suspend the Mailers' Trade District Union for delinquency, or whether delinquency could arise out of failure to meet the particular demand here made, need not be considered in the light of pure questions of power. It suffices to deal with the demand and the express or implied threat of consequences respecting merit as judged by standards of ordinary fairness. If we assume, as the trial court was doubtless obliged to assume—because the appellant in substance so asserted—that the demand was made and the threatened consequences were to be visited upon the Mailers' Trade District Union, as an adversary party in pending litigation, it was relevant not only to the subject-matter of the litigation, but more particularly to conduct by one party toward another. Upon entirely elementary principles, the appellees, being the representatives of the Mailers' Trade District Union, had the right to appeal to the court for protection against an attempt well calculated to embarrass them as a party in pending litigation. At the time of the demand the result of the suit had vindicated its commencement by the appellees, and such result serves as a legal response to the attitude of appellant and its officers respecting resort to judicial power; and it serves not only as an adequate basis for declining to meet the demand, but for the additional restraint provided in the decree.

The third aspect of the decree deals with the so-called "Detroit" proposed amendments to the appellant union's organic law. They are drawn upon the hypothesis of the possible failure of the amendments which aim to abolish the Mailers' Trade District Union. Counsel for the appellants assert that the question becomes moot if the decree which deals with proposition 120 is reversed, but that it "will become important if, and only if, this court should affirm that part of the final decree which enjoined the enforcement of proposition 120. In that event the appellants will desire to reinitiate the Detroit amendment and the final decree should be modified to permit their so doing."

Under the 1926 laws of the appellant union, three, of four, executive officers were elected by votes of both printers and mailers, and the fourth by votes of the mailers only.

Local mailers' unions were entitled to delegates to the convention of the appellant union, their number varying from one to four, according to the size of the union.

The proposed amendments limited the right to vote for the three of the executive officers above noted, to printers only, the mailers retaining their exclusive right to vote for the fourth. The local mailers unions are deprived of the right to delegates to the convention of the appellant union, but instead, the Mailers' Trade District Union was given the right to send four delegates. This gave the latter organization a status as a subordinate local union.

We assume that by comprehending these proposed amendments within the scope of the decree, the trial court considered them in the light of the evidence as it might bear upon their validity, regardless of the conclusion which the court might reach upon the other aspect of the case. That involved a consideration of entirely analogous matters to determine an analogous question or issue. On each aspect the relationship and the status of the different organizations bore pertinently upon the nature of the amendments in their effect upon rights "vested" or "property." We feel that the evidence amply sustains the contention that in view of the relationship of these different organizations and their members, the right to vote should in no event be held to be unsubstantial and not appertaining to individual membership in local unions; and upon this view the proposed amendments are plainly unreasonable and discriminatory.

The decree of the District Court is affirmed.

### On Petition for Rehearing.

PER CURIAM. On application for rehearing, appellants criticize a portion of the opinion herein, viz., that the "Detroit" amendments *"are drawn upon the hypothesis of the possible failure of the amendments which aim to abolish the mailers' trade district union."* This language, being taken, as it may be, to deal with the chronology or order of the two proposals, is inaccurate. The "Detroit" amendments, in their draft, submission, attempted or threatened submission, were first in time. When, however, both propositions were brought before the court in the same proceeding, and comprehended in the decree, time or order of initiation became unimportant. The court was obliged to consider them percisely as both parties insisted they should be; that is to say, on appellant's side, if proposition 120 is valid, Detroit amendments become moot, but, if prop-

osition 120 be invalid, the Detroit amendments are good; whereas, on respondents' side, Detroit amendments were challenged upon considerations arising on the proofs—regardless of the fate of "proposition 120."

The motion for rehearing is denied.