RANDOLPH, AS PRESIDENT ET AL. *v.* LEEMAN ET AL.

[No. 18,796. Filed December 9, 1957. Rehearing denied January 10, 1958. Transfer denied December 9, 1958.]

*Clarence R. Martin, Owen S. Boling,* both of Indianapolis, *Gerherd P. Van Arkel* and *Van Arkel & Kaiser,* of Washington, D. C., for appellants.

*Andrew Jacobs,* of Indianapolis, and *Bliss Daffan,* of Houston, Texas, for appellees.

ROYSE, P. J.—The International Typographical Union is a voluntary unincorporated labor union having more than 90,000 members and several hundred subordinate or local unions, of which Houston (Texas) Typographical Union No. 87 is one. (Hereinafter appellants will be referred to as I. T. U. and appellees as Houston). The I. T. U., the local unions and all members are governed by I. T. U.'s Constitution, By-Laws and General Laws.

The dispute herein arose over the refusal of the Executive Council of I. T. U. to submit an amendment to the Constitution of I. T. U. in the form proposed by the Houston and other locals to a referendum of the membership of I. T. U. after said Executive Council held the proposed amendment did not comply with the requirements of the Constitution of I. T. U.

The pertinent provisions of the Constitution and By-Laws of the I. T. U. are as follows:

"Article XVI, Section 1. *Amendments to the Constitution of the International Typographical Union may be enacted only by referendum vote of the general membership. Such amendments may be initiated only in one of three ways, as follows:* (a) The Executive Council may initiate and submit any proposition or amendment a majority of its members deems necessary. Such propositions or amendments to be published to the craft at least thirty days before taking the vote thereon. (b) Convention may initiate any proposition or amendment a majority of the delegates deem necessary. Subordinate unions shall then discuss the proposed amendments, and at a date which shall be designated by the Executive Council, but which must be within three months from the adjournment of the convention, the proposed amendment shall be voted upon by the members of subordinate unions, and the vote in detail forwarded, under seal to the Secretary-Treasurer of the International Typographical Union within ten days after the date

set by the Executive Council for the taking of said vote, when the International President and Secretary-Treasurer, and one member of the local union, who shall be selected by the President of this body, shall canvass the vote and declare the result to the craft, and should a majority of the votes cast be in favor of the amendment, it shall go into effect sixty days after the canvass of the vote on the same. (c) *After one month's notice to its members any subordinate union may initiate any proposition or amendment and submit to other subordinate unions for endorsement.* Whenever such initiative petition has been endorsed by 150 subordinate unions, the endorsement of such petition having been secured within three months from the date said petition was initiated, it shall be submitted to a vote of the general membership. The proposals as submitted for the endorsement of subordinate unions shall be published in the first issue of the Typographical Journal following the receipt of 150 endorsements by subordinate unions. The Secretary-Treasurer shall publish in the next issue after the three months have elapsed the full list of all unions endorsing any proposition or amendment. Within thirty days following such publication the proposal shall be submitted to a vote of the membership, which shall be taken on a day designated by the Executive Council, and canvassed in the same manner as amendments and propositions referred to the membership by a convention of the International Typographical Union. It shall be the duty of the Secretary-Treasurer to prepare ballots and submit any propositions or amendment initiated in either of the three ways provided; Provided, if for any reason the Secretary-Treasurer shall fail or refuse to prepare ballots and submit any proposition or amendment which has been properly initiated and endorsed, the President of the International Typographical Union shall perform the function." (Our emphasis.)

"Article XVI, Section 2, Const.—Propositions submitted to subordinate unions for endorsement or to the membership for adoption as herein provided *shall be drafted in proper form and shall include all sections or articles amended or repealed*

*by such proposition:* Provided, For this purpose amendments or propositions shall be deemed to be in proper form *if their purpose is clear and the intent understandable. Laws or parts of laws to be repealed shall be placed in brackets,* and amendments to existing laws and new laws shall be printed in bold-face type." (Our emphasis.)

"Article VI, Section 5, Const.—There shall be an Executive Council, consisting of the President, the First Vice-President, the Second Vice-President, the Third Vice-President and the Secretary-Treasurer, which body *shall have general supervision of the business of the International Union and of subordinate unions."* (Our emphasis.)

"Article VIII, Section 8, By-Laws—The Executive Council shall have authority to interpret and enforce contracts and agreements; interpret and construe the laws of the International Union and subordinate unions; and it shall have authority to enforce such interpretation and construction unless and until reversed on appeal as herein provided. It shall have the power and jurisdiction to decide all questions properly brought before it relating to the business and affairs of the union. It shall have such further powers and perform such other duties as may be set forth in the constitution and laws."

"Article VIII, Section 9, By-Laws—Any member affected by a decision or action of the Executive Council, or any aggrieved subordinate union, shall have the right to appeal to the next succeeding convention of the International Typographical Union."

"Article IV, Section 38, By-Laws—The party or subordinate union desiring to appeal against a decision or action of the Executive Council shall give to the International Secretary-Treasurer notice of such appeal within sixty days of the date of the decision or action against which appeal is to be made: Provided, No such appeal shall be considered by a convention unless notice as herein provided shall have been given prior to the first day of the month in which the convention is held."

"Article IV, Section 43, By-Laws—Any subor-

dinate union, member or members not satisfied with the judgment of the court of last resort (the convention of the International Typographical Union) and who seeks redress in the courts, shall be required to deposit with the Executive Council an approved bond sufficient to cover the costs entailed by the International Typographical Union in defending the action, and the same procedure shall be followed when any member or members shall seek an injunction against the International Typographical Union or its officers or any of its subordinate unions.

"Article IV, Section 44, By-Laws—In no case shall a member appeal to a civil court or any other agency for redress from an action by the union until he has exhausted his rights of appeal under the laws of the International Union. Any member who violates this section shall be liable to summary expulsion by the Executive Council."

The facts as disclosed by the record herein necessary to a determination of the question presented may be summarized as follows:

Early in October, 1953, Houston proposed and submitted to all subordinate locals the following proposal to amend the Constitution of the I. T. U.:

"New section to be numbered Section 14, Article IX, I. T. U. Constitution immediately following the present Section 13, and renumber the present Section 14 to be Section 15:

"Sec. 14. No money or securities in the treasury of the International Typographical Union shall be used or expended for purposes of promulgation or dissemination of opinion or argument, whether printed, published in The Typographical Journal or otherwise, in support of or in opposition to the political views of any officer member or political faction within the International Union. This section is not to be construed to invalidate present existing laws governing publication of letters of candidates in the April and May Typographical Journal."

This proposal was indorsed by one hundred fifty subordinate locals.

Sometime prior to December 11, 1953, Don Hurd, Secretary-Treasurer of I. T. U. received this proposal. On that date he notified the President of I. T. U. that he did not consider the amendment in proper form and did not intend to submit it to a referendum of the membership. Woodruff Randolph, the President, then examined the proposal and concluded it was not in proper form; that its effect would be to repeal or amend existing laws which were not set out in the proposal as required by the provision of the Constitution in reference to amendments, and that it was not clear and understandable.

On December 17, 1953, the Executive Council of I. T. U. held the Houston proposal did not meet the requirements of Section 2, Article XVI of the Constitution.

On or about May 7, 1954, appellees commenced this action against appellants in which they sought to mandate Hurd as Secretary and Randolph as President to submit the proposed amendment to a referendum vote of all members of I. T. U. On May 11, 1954, the Executive Council of I. T. U. issued its decision and mandate to the President and Secretary of Houston in reference to the bringing of this action. This decision, after referring to the action and the appropriation of $2000 by Houston to pay the legal expenses of this action, proceeded to interpret numerous provisions of the Constitution and By-Laws of I. T. U. which had been violated by Houston and stated because Houston had not appealed the decision of the Executive Council it had no right to sue in the civil courts; that its charter may be suspended because of such action. It further mandated each and every member of said Houston to

withdraw said action and called upon said Houston to report the names of any other local supporting Houston in this action. It concluded with this statement: "It is further interpreted and construed that any member affected by this decision may appeal to the succeeding Convention of the International Typographical Union, August 14-20, 1954."

On or about October 14, 1954 Houston filed in a single paragraph what it designated as a "First Amended and Supplemental Complaint" for Injunction. This amended and supplemental complaint, in addition to the relief sought in the original, sought to enjoin I. T. U. from taking punitive action against Houston because it instituted this action.

At the trial it was stipulated by the parties that Houston did not take an appeal to the 1954 Convention of I. T. U. from either the decision of December 17, 1953 or that of May 11, 1954.

The trial court, on proper request, made and filed its special findings of fact and stated conclusions of law thereon favorable to appellees. The judgment of the court is as follows:

"Wherefore, it is considered, adjudged and decreed, that the proceedings of the Executive Council and Convention of the I. T. U. in its purported determination that the proposed Houston amendment was not in proper form are null and void and hereby annulled, and that the decision and determination of the defendant Don Hurd, as Secretary-Treasurer of I. T. U. and the decision of Woodruff Randolph, as President of I. T. U., that said proposed Houston amendment does not meet I. T. U. constitutional requirements, was arbitrary and not supported by the facts and such decisions and determinations are therefore likewise null and void and are hereby annulled; that the decision of the Executive Council mandating Houston Typographical Union No. 87 to pay no expenses

of this litigation from its own funds is without the jurisdiction of the Executive Council and is null and void and is hereby annulled.

"It is directed that the defendant Don Hurd be and he is hereby ordered to publish the amendment initiated by the Houston Typographical Union No. 87, and endorsed by 150 subordinate unions, and which reads as follows: (Heretofore set out.)

"The defendants, and each of them, are hereby enjoined from taking any punitive action against Houston Typographical Union No. 87, or any other local or subordinate union within the I. T. U., or any of the members or officers thereof, for having brought, encouraged the bringing, or financing this litigation."

By proper assignment of error appellants have here attacked the judgment on several grounds. However, because of the conclusion we have reached we deem it necessary to consider only the question of whether "appellees were obliged to, and failed to exhaust their remedies within the I. T. U. before filing suit".[1]

Appellants contend the appellees failed to exhaust their remedies within the I. T. U. They are required to exhaust those remedies, both by the Constitution of the I. T. U. and by well-established law in Indiana, before going to court. No rights of appellees would have been prejudiced by an appeal to the Convention. Appellees cannot be heard to claim any rights under the laws of the Union, while at the same time they disclaim their obligations under those laws.

Appellees contend the Executive Council did not have the power to deny a referendum on the proposed amendment. In support of this contention they assert

---

1. Sec. 2-3233, Burns' 1946 Repl.—"The Supreme Court may reverse or affirm the judgment below, in whole or in part, and remand the cause to the court below, but the court *shall not reverse the proceedings any further than to include the first error.*" (Our emphasis.)

the Secretary-Treasurer of the I. T. U. has the primary duty to determine, in reference to a proposed amendment under Article XVI, Section 1, the following facts: (1) Was the amendment initiated after one month's notice? (2) Was it endorsed by 150 subordinate unions within three months from the date it was initiated? (3) Was its purpose clear and the intent understandable? If the proposed amendment meets these three requirements, the Secretary-Treasurer is obligated to cause the publication of the proposed amendment, following the receipt of 150 endorsements by subordinate unions, in the Typographical Journal, then after three months to publish a full list of all unions who endorsed the amendment, and prepare ballots to be used in submitting the amendment to referendum; that if the Secretary-Treasurer fails or refuses to do these things, the President shall make such determination and perform those duties. They then contend they were not obliged to appeal to the Convention because they had exhausted their I. T. U. remedies.

The question we are here considering has been before the courts of this State and in many other jurisdictions.

The case of *Supreme Council of the Order of Chosen Friends* v. *Forsinger* (1890), 125 Ind. 52, 25 N. E. 129, involved a disability contract of insurance. The court in an opinion by Judge Elliott held the valid by-laws of the Association formed a part of the contract of insurance. One of the provisions of the by-laws provided upon receipt of notice of disability for a hearing by certain officers and procedure such officers must follow. It then provides:

"This decision shall be final and conclusive upon the parties affected thereby unless reversed upon appeal by the Supreme Council in regular session. Any claimant feeling aggrieved may take such an appeal by serving notice thereof upon the supreme

recorder within thirty days after receipt of notice by the claimant of the decision, . . . . The Supreme Council shall accord the appellant a hearing at its next regular session, and dispose of the matter."

Appellee did not appeal to the Supreme Council. That was the question before the court. After reviewing numerous authorities on the question presented, the court, in reversing the decision of the trial court, said:

"The clear implication from all the provisions of the by-laws is that the member must, at least, exhaust the remedies provided by the contract before seeking aid from the courts, or show some excuse for his failure to do so. We do not doubt that if the officers of the society should refuse an appeal, or do any act hindering or delaying an appeal, the member might at once invoke the assistance of the courts. *Supreme Sitting, etc.* v. *Stein,* 120 Ind. 270. But it can not be presumed, in the absence of averments to the contrary, that the officers have been guilty of a breach of duty, so that it is incumbent upon a party who relies upon the wrong of the corporate officers to show by affirmative allegations their wrongful conduct."

The case of *Louisville & Nashville Railroad Company et al.* v. *Miller et al.* (1942), 219 Ind. 389, 38 N. E. 2d 239, involved a dispute between members of the Brotherhood of Railway Trainmen. It involved the seniority rights of employees of the L. & N. and the C. & E. I. Railway Company, which arose when the switching of the C. & E. I. was transferred to the L. & N. Yards in Evansville. In reversing the decision of the trial court in granting a permanent injunction to the appellees, the Supreme Court, speaking through Judge Fansler, said in part:

"Whatever seniority the appellees enjoy vests in them by virtue of their having become members

of the brotherhood. The rights are granted to them as members subject to the condition that they comply with the rules of the brotherhood, and that the right to seniority as between the members of the brotherhood shall be determined under the laws of the brotherhood."

The court then cited numerous authorities to sustain its conclusion.

In *State ex rel. Givens, etc.* v. *Marion Superior Court, Room 1* (1954), 233 Ind. 235, 117 N. E. 2d 553, the Supreme Court entered a permanent writ of prohibition against the trial court prohibiting it from taking any further action in a case where certain members of a trade union sought to enjoin the acting officers of the union from dispensing with an impending election of officers and from issuing any ballots therefor not submitting plaintiff's candidacy or those of others lawfully nominated. The Court, in an opinion by Bobbitt, J., held that:

"A voluntary association may, without direction or interference by the courts, for its government, adopt a constitution, by-laws, rules and regulations which will control as to all questions of discipline, or internal policy and management . . . .

"As a general rule courts will not interfere to *control the administration of the constitution and by-laws of such association, or to enforce rights springing therefrom.*" (Citing authorities.) (Our emphasis.)

In 4 Am. Jur. (Associations and Clubs), §17, p. 466, it is stated:

"It is well established that courts will not interfere with the internal affairs of voluntary associations, except in such cases as fraud or lack of jurisdiction. Accordingly, it is held that mandamus will not lie to regulate the affairs of unincorporated societies or associations, at least not in the absence of a permissive statute. Nor will

an injunction be granted where the association is proceeding in accordance with its rules, and within the scope of its jurisdiction. The decisions of the tribunals of an association with respect to its internal affairs will, in the absence of mistake, fraud, collusion, or arbitrariness, be accepted by the courts as conclusive. Moreover, it is held that the courts will not undertake to inquire into the regularity of the procedure adopted and pursued by such tribunals in reaching their conclusions."

Of course, as indicated in *Supreme Council etc.* v. *Forsinger, supra,* where the officers of such an Association refuse an appeal or do any act which hinder or delay an appeal, the foregoing rule would not apply. An example of the first of these circumstances is found in *McNichols et al* v. *International Typographical Union et al.* (1927), 21 F. 2d 497, which involved the action of the then President of the International Typographical Union in attempting to submit a proposal for amendment of the Constitution over the objection of four members of the Executive Council. The President refused to permit an appeal and proceeded to submit the amendment to a referendum. In affirming the granting of a temporary injunction by the District Court, the Circuit Court of Appeals, in an opinion by Judge Evans, set out certain provisions of the Constitution and By-Laws, and said in part:

"After considering all of the provisions above quoted, however, we are convinced that they may be and should be, reconciled and each given effect. This can be accomplished by giving due recognition to the powers and duties of the executive council. Among other things, section 7 of Article 6, which deals with 'Duties of Officers', provides that the executive council 'shall have general supervision of the business of the International Union and of subordinate unions.' From the very nature of this organization, the executive council is a body of extensive power and authority. This provision,

as well as those found in sections 1 and 3 of article 17, necessitate the conclusion that the submission of any proposed amendment must be by the executive council.

"But what shall be submitted? Anything proposed by 150 unions? Obviously not. Only *any provision or amendment,* the indorsement of such *petition* having been secured within three months,' shall be submitted.

"Who determines whether the proposal comes within the language above quoted? Of necessity, the executive council. Assuming, in view of the title to article 17, the words 'proposal,' 'amendment,' and 'petition,' are used synonymously, and are intended to mean merely a proposed amendment, could it be successfully argued that, if there was a difference of opinion among the executive council as to the date when certain indorsements were made, the president of the executive council could act alone or could override the other members and assert a date contrary to the fact or contrary to the best judgment of his four associates? Obviously not. If there was a question as to the number of indorsements received, and four of the executive council believed that 140 instead of 150 indorsements had been seasonably made, could it be urged that the president of the council might find the number to be 150 and thereupon act in defiance of, and against the votes of, the other four. Nowhere is the president, under article 6, given any such power or authority."

In the case of *Sibilia et al.* v. *Western Electric Employees Ass'n, Inc. et al.* (1948), 142 N. J. Eq. 77, 59 A. 2d 251, the facts as stated by the Court of Errors and Appeals of New Jersey, were as follows:

"It appears that the defendant association is an independent labor organization, not affiliated with any national union, consisting of about 18,000 members, and that it functions through a group of 25 elected Employee Representatives. Opposition developed to the incumbent Representatives and a group of 25 candidates grouped together

under the name of the Red, White and Blue Ticket at the election scheduled to be held on September 9th, 10th and 11th, 1947. The elections are conducted under the auspices of a Board of Elections of which the defendant Fred J. Ambrose was the Chairman at the September election. The other defendant, Frank J. Fitzsimmons, was the president of the association.

"The election was held on the appointed days, most of the votes being cast on voting machines rented for the purpose but some of them being cast in the form of paper ballots. At the close of the polls on September 11th the Board of Elections took the tally of the voting machines. The next day Ambrose announced that the paper ballots would be counted and the results of the election would be made known on September 16th. The totals of the voting machines made it apparent that the Red, White and Blue ticket was victorious, since their lead was too large to be overcome in the count of the comparatively few paper ballots. Instead of announcing the results on September 16th, the chairman announced that the committee had voted to set aside the election on the ground that the constitution of the association had been violated in the manner in which some of the candidates conducted their campaigns, by use of advertising and methods other than personal contact as required by the constitution."

The court, in affirming the action of the trial court in granting an injunction, appointing a master to tabulate his report, and appointing a custodial receiver, said:

"The constitution of the association gives the Chairman considerable power in procedural matters respecting elections, but it gives no power to void an election after the votes have been cast and nearly all counted. A group could perpetuate itself in office by the tactics attempted unless the Court of Chancery has power to intervene, since it is evident that quo warranto alone would be ineffective."

In *Hutcheson et al.* v. *Hanson* (1951), 121 Ind. App. 546, 38 N. E. 2d 688, this court held the International Carpenters Union had no authority to expel a member of a local union at its National Convention, nor did it have any authority to direct such local as to what it must do regarding such membership. In that case it was the International Convention, the Union's highest authority, whose action we held illegal.

It seems to us that it is well settled that as a general rule a member of such association may not seek redress from the courts until he has exhausted all the remedies provided for by the Constitution and By-Laws of the Association.

Appellees assert that an amendent to Article XVI adopted after the decision in the case of *McNichols et al.* v. *International Typographical Union et al, supra,* deprived the Executive Council of any power to deny submission of the proposed amendment to a referendum. They base this contention on a statement made by Randolph at the time the proposed amendment to Article XVI was before the Convention to the effect that "when (an) amendment has received the . . . endorsements required, the executive council should be mandatorily ordered to submit the amendment. The law should specifically provide that neither the Executive Council, a Convention, nor any agency within the union, shall have the right to interfere with amendments which have been properly endorsed." A most casual examination of Article XVI, *supra,* in force at all times referred to herein, will show the provision recommended by Mr. Randolph was not adopted.

Article VIII, Section 8, heretofore set out, specifically gives the Executive Council authority "to . . . interpret and construe the laws of the International Union and subordinate unions;". Section 9 provides for an

appeal to the succeeding convention by any member or subordinate union aggrieved by the action of the Executive Council in such matters. It seems to us the two last referred to provisions of the By-Laws are clear, succinct and unambiguous. They were in full force and effect at all times involved in this action. In our opinion Houston was bound by these provisions as were all members and subordinate unions. For, as stated in *Supreme Council of the Order of Chosen Friends* v. *Forsinger, supra,*

> "Until the claimant has done what his contract requires, or has shown some valid excuse for not doing it, he can not have any standing in court. . . . It is certainly imposing no hardship upon the member to require him to pursue the mode pointed out by his contract. The rule we declare is, indeed, favorable to him, for it enables him to appeal to the courts after he has exhausted the remedies designated in the by-laws notwithstanding the provisions of his contract. The member who asks to be relieved from the duty of appealing to the governing body, in such a case as this, asks what equity and justice deny."

In their brief appellees say:

> "We concede the proposed amendment was subject to referendum only 'if [its] purpose is clear and the intent understandable.' The Secretary-Treasurer, thence the President, obviously was required to determine this single question."

Conceding, but by no means deciding, appellees are correct in their contention that the Executive Council did not have power to pass on the proposed amendment, the record shows indisputably that both the Secretary-Treasurer and the President did declare that the purpose of the amendment was not "clear" or its "intent" understandable. This being true, Houston correctly

admits neither of these officers was required to submit it to a referendum. If it believed this determination of those officers was erroneous, arbitrary or capricious, they had the right, duty and obligation to appeal their decision to the Convention as provided for in the By-Laws.

As heretofore set out, the decision of the Executive Council of May, 1954, gave to Houston the right to appeal that decision to the Convention in August, 1954. Had it accepted that invitation the whole action of the Secretary-Treasurer, President and Executive Council could have been brought before the International Convention, despite the fact they had failed to appeal the first decision within the time prescribed by the By-Laws. This it refused to do. In our opinion the failure to exhaust their remedies under the Constitution and By-Laws of I. T. U. deprived Houston of the right to bring this action.

Judgment reversed, with instructions to the trial court to restate its conclusions of law in accord with the views expressed herein, and to enter judgment accordingly.[2]

Crumpacker and Pfaff, JJ., dissent with opinion to follow.

---

2. The records of this court show that on November 14, 1957, the following order was made:

"After an examination of the briefs of the parties in the above entitled case, the court would prefer that in oral argument they confine themselves to the question of appellee's failure to exhaust their remedies and right of appeal in I.T.U. under its Laws.

"Through an inadvertence the time alloted was in the notice given as 45 minutes to each side. The time alloted will be 30 minutes to each side.

"The Clerk of this Court is directed to send the foregoing notice to the attorneys of the parties in this case.

"(Signed) Harry L. Crumpacker, C.J."
ROYSE, P.J.

### DISSENTING OPINION.

CRUMPACKER, J., dissents in which PFAFF, J., concurs.—The court has reversed the judgment herein solely because Houston did not appeal the decision of the Executive Council to the 1954 Convention and thus, by failing to exhaust its remedies under the union Constitution, forfeited its right to resort to the civil courts for relief. I cannot agree. The record discloses that all of Houston's constitutional rights have been exhausted. The 1954 Convention, on its own motion, took up the Houston case, appointed a committee to investigate its merits and report to the Convention. On August 20, 1954, the Convention received and approved the following report of its said committee:

"It seems that the nub of this controversy is simply this: Does the Executive Council have authority to interpret and enforce I. T. U. laws?

"In ruling that the Houston Proposition could not be sent to referendum, the Council did so on the ground that it did not meet requirements of the law. The local union claims it did, but that even if it didn't, the Secretary-Treasurer or President was obligated to submit it.

"In the opinion of your committee this reasoning is ridiculous. The law requires that propositions to be submitted to referendum must meet certain specifications. It necessarily follows that some agency or person must determine if the specifications are met. Section 8, Article VIII, By-laws, unmistakably gives the Council the power to interpret and enforce our laws. No other agency is given the power anywhere in the book. The Houston Union seeks to justify its action in seeking an injunction before appealing to the convention by contending it could not appeal. The Council held that it could, but, again, the local union refused to recognize the Council's right to interpret the law in this matter.

"It is our considered opinion that in every respect the interpretations and decisions of the Executive

Council regarding the Houston Proposition and subsequent developments was correct and proper and we regard the attitude and actions of Houston Typographical Union as reprehensible and worthy of severest censure. . . ."

The court's opinion relies heavily on the fact that Houston stipulated that it did not appeal its grievances to the Convention of 1954 as it had the constitutional right to do. I am unable to understand what difference that fact makes. Houston's grievances got to the Convention as effectively as though there had been an appeal and the Convention determined them. The Constitution and By-laws of the union provide no further or additional remedy than the decision of the Convention.

It is true that this action was filed in the interim between the action of the Executive Council complained of and the convening of the 1954 Convention and was therefore prematurely brought. No plea in abatement was addressed to it but, on the contrary, the appellant appeared generally and pleaded in bar. This constituted a waiver of all matters in abatement, *General Ice & Coal Co.* v. *George, Tr.* (1938), 214 Ind. 518, 14 N. E. 2d 1002, and before trial Houston's cause of action had matured by the action of the 1954 Convention in fully and finally adjudicating its grievances.

In addition to what I have said above the record in this case demonstrates beyond peradventure the absolute futility of a formal appeal by Houston.

NOTE.—Reported in 146 N. E. 2d 267.