Ray E. PLUMMER, Plaintiff–Appellant,

v.

AMERICAN INSTITUTE OF CERTI-
FIED PUBLIC ACCOUNTANTS,
Defendant–Appellee.

No. 95–2677.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 29, 1995.

Decided Oct. 7, 1996.

Karl J. Veracco, Larry L. Barnard (argued), Miller, Carson, Boxberger & Murphy, Fort Wayne, IN, Paul D. Refior, Warsaw, IN, for Plaintiff–Appellant.

John C. Hamilton (argued), John E. Doran, Doran, Blackmond, Ready, Hamilton & Williams, South Bend, IN, for Defendant–Appellee.

Before POSNER, Chief Judge, COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

This appeal arises from a disciplinary action taken against Ray E. Plummer by the American Institute of Certified Public Accountants ("AICPA"). The AICPA claimed that Plummer, while acting in his capacity as an accountant, violated the organization's

1. Accountants are licensed and regulated by the state of Indiana. However, this case involves the actions of the AICPA, a *private* voluntary association whose disciplinary procedures are separate from those of the state.

2. "The practice of public accounting consists of the performance for a client, by a member or a

ethical rules concerning conflicts of interest by performing an audit of real estate that belonged to a trust of which he was a co-trustee. The AICPA disciplined Plummer for his misconduct pursuant to the organization's Bylaws. Plummer requested that the district court (1) declare the AICPA's disciplinary actions arbitrary, capricious, and contrary to Indiana law, and (2) enjoin the AICPA from publishing its disciplinary findings. The court denied Plummer's request for declaratory and injunctive relief. We affirm.

## I. BACKGROUND

The plaintiff, Ray E. Plummer, is a certified public accountant ("CPA") and is licensed to practice his profession in the state of Indiana.[1] Since 1973, he has been a member of two voluntary professional associations, the Indiana Society of Certified Public Accountants and its national counterpart, the appellee AICPA. The broad purpose of the AICPA is to promote and maintain high professional standards among its membership. Accountants who join the AICPA agree to comply with the organization's Code of Professional Conduct ("the AICPA Code"), as well as the organization's rules and Bylaws. We briefly set forth the portions of the AICPA Code concerning conflicts of interest in the accounting profession.

### A. The AICPA Code & Conflicts of Interest

Like many professional codes of conduct, the AICPA Code sets forth both guiding principles and specific rules. Among the general principles of the Code is that:

A Member should maintain objectivity and be free of *conflicts of interest* in discharging professional responsibilities. A member in public practice[2] should be independent in fact and appearance when providing auditing and other attestation services.

member's firm, while holding out as CPA(s), of the professional services of accounting, tax, personal financial planning, litigation support services, and those professional services for which standards are promulgated ... [including auditing and attestation services]." AICPA Code (1991), Section II, Rules: Definitions.

AICPA Code (1991), Article IV, "Objectivity and Independence."

Rule 101 sets forth this principle of independence in mandatory rather than precatory language. It states that "A member in public practice *shall* be independent in the performance of professional services...." AICPA Code (1991), Section II, Rule 101 (emphasis added). The commentary accompanying and explaining this rule includes the following example:

> *Independence shall be considered to be impaired if* ... a member had any of the following transactions, interests or relationships:
>
> A. *During the period of a professional engagement* or at the time of expressing an opinion, *a member* or a member's firm
>
> ....
>
> 2. *Was a trustee of any trust* ... *if such trust* ... *had any direct or indirect financial interest in the enterprise* [for which professional services were performed].

AICPA Code (1991), Section II, Interpretation 101–1 (emphasis added).

### B. *Plummer As Co–Trustee of the Saemann Trust and Auditor of MidTown Estates*

The ethical charges against Plummer stem from accounting work that he performed in 1989–90 in connection with MidTown Estates, an apartment complex in Elkhart, Indiana. Plummer, according to the AICPA, had a conflict of interest because he conducted an audit of MidTown Estates while serving as co-trustee of a trust that was the sole owner of the property.

Frank Saemann and his wife, Irene, along with another couple, Tom and Susan Smith, purchased MidTown Estates in 1981. They obtained a loan for this purpose from the United States Department of Housing and Urban Development ("HUD"), assuming in exchange a HUD note and mortgage. HUD, the mortgagor, also insured the property and thus received copies of relevant financial documents, including the results of any audits on the property. Shortly after purchasing Mid-Town Estates, the Saemanns "bought out" the Smiths' interest in the property and acquired title as tenants-by-the-entirety.[3]

In 1983, a trust was established in Frank Saemann's name ("the Franklin I. Saemann Trust" or "the Trust"), with a minimal amount of funding. Mr. Saemann himself was named the sole trustee.

By the summer of 1986, Mr. Saemann was eighty years of age and in failing health, suffering from advanced Parkinson's disease. His daughter filed a petition with the Kosciusko, Indiana County Circuit Court asserting that Mr. Saemann was "unable to maintain and care for his financial affairs" and requesting the appointment of a temporary guardian. The court granted the petition and appointed the First National Bank of Warsaw, Indiana as temporary guardian. The temporary guardian proceeded to marshall the assets of Mr. Saemann, including MidTown Estates, and received assistance from Ray Plummer, who had been the Saemanns' accountant since the early 1980's.

In early Fall 1986, the court took measures to transfer Mr. Saemann's assets from the temporary guardian to the Saemann Trust, after determining that it would be in the best interest of Mr. Saemann and his wife for the Trust to manage Mr. Saemann's finances. First, the court ordered Mr. Saemann to resign as trustee of the Trust. Three co-trustees were appointed to succeed Saemann: the First National Bank of Elkhart, Indiana, an individual named P.J. Brannen, and the appellant, Ray Plummer. At the request of the temporary guardian, the court also appointed the First National Bank of Elkhart as a successor temporary guardian. The court then ordered the successor temporary guardian to "execute and deliver deeds and instruments necessary to convey all the property held for the benefit of or in the name of Franklin I. Saemann to the successor trustees of the ... Trust." The court made no

---

**3.** "In Indiana, the single legal entity created by the fiction of unity of the spouses holds or 'owns' tenancy by the entirety property. .... Thus, neither spouse alone may do anything to destroy the tenancy, including transferring an interest, without the other spouse's consent...." *In re Estate of James H. Grund,* 648 N.E.2d 1182, 1185 (Ind.App.1995).

distinction between properties owned by Mr. Saemann individually and those owned by Saemann and his wife jointly as tenants-by-the-entirety. The successor temporary guardian, in compliance with the court's order, provided, *inter alia*, a warranty deed (executed October 10, 1986) purporting to transfer MidTown Estates to the Trust. After having arranged for the transfer of Frank Saemann's property to the Trust, the court terminated the guardianship proceedings and discharged the First National Bank of Elkhart as successor temporary guardian.

Frank Saemann died on July 26, 1987, some nine months following the transfer of MidTown Estates to the Trust. Subsequently, Irene Saemann asked Plummer and Company, Inc. (Ray Plummer was the sole owner and partner of this firm) to perform an audit of MidTown Estates. At this time, Plummer was serving as a co-trustee of the Trust, the legal owner of MidTown Estates. Nevertheless, Plummer agreed to conduct the audit and confirmed the auditing agreement with a letter to Irene Saemann dated November 27, 1987. In this letter, Plummer stated that "as co-trustee of the Franklin I. Saemann Declaration of Trust I will not discuss, vote, or take part in any actions of the ... Trust concerning MidTown Estates." Plummer explained that he was taking this action in order that he might "preserve [his] independence as an auditor," even though MidTown Estates represented only a small portion of the Trust assets. The "field work" for the audit of MidTown Estates was performed in 1989 and early 1990, and on February 21, 1990 Plummer submitted the audit results to the Trust (not to Irene Saemann). The audit covered the two-year period ending December 31, 1989.

When HUD, in its capacity as mortgagor and insurer of the MidTown Estates property, received a copy of Plummer's February 21, 1990 audit, it reviewed the contents of the audit report and supporting documents, to ascertain whether the property was operating on a financially-sound basis. Upon review, HUD detected an apparent conflict of interest on Plummer's part, for it was evident that Plummer had performed the audit of MidTown Estates and submitted his report while serving as a cotrustee of the Trust, the owner of the property. HUD wrote Plummer protesting what appeared to be an ethical violation arising out of Plummer's lack of independence from the auditee. Plummer responded on July 17, 1990, stating that HUD need not be concerned with this apparent conflict of interest because he had neither discussed, voted, nor taken part in any action of the Trust concerning MidTown Estates.[4]

In a second letter to HUD, dated August 22, 1990, Plummer advanced another justification for his actions. He notified the Regional Inspector General of HUD that "two weeks ago it came to light that the MidTown Estates property is actually owned by Irene L. Saemann, and not the ... Trust." This, according to Plummer "[made] the independence issue moot with Irene L. Saemann personally owning the MidTown Estates property." HUD disagreed and filed a complaint with the AICPA that led to disciplinary proceedings against Plummer.

### C. *Conveyance of MidTown Estates Ruled "Void Ab Initio"*

On August 13, 1991, Irene Saemann petitioned for a reopening of the guardianship proceedings "in order to clarify and adjust certain actions taken pursuant to a prior Court order." Specifically, her petition sought to have the circuit court invalidate conveyances to the Trust (in 1986) of certain properties (including MidTown Estates) jointly owned by herself and her late husband, Frank Saemann. The Kosciusko County Circuit Court granted the petition and, in an order dated October 7, 1991, declared that the "instruments executed by the temporary guardian and the Saemanns purporting to transfer any of the Saemanns' tenancy-by-the-entirety properties to the Trust are void *ab initio*." *In re Guardianship of Franklin I. Saemann*, No. G–86–12

---

4. When it filed a complaint with state regulatory officials concerning Plummer, *see* note 6 *infra*, HUD questioned Plummer's assertion that he had not been involved in any Trust actions involving MidTown Estates. HUD cited as an example Plummer's certification, as co-trustee, of MidTown Estates' 1989 financial statements.

(Kosciusko Cir. Ct. filed October 7, 1991). Apparently, the basis for the court's decision was the well established rule of property law that forbids one tenant-by-the-entirety from acting unilaterally to convey or transfer property that is jointly-owned. *In re Estate of Grund,* 648 N.E.2d at 1185; Roger A. Cunningham et al., *The Law of Property* § 5.5 (2d ed.1993). Although Frank Saemann and his wife, along with Mr. Saemann's temporary guardian [the First National Bank of Elkhart], had each signed the deed purporting to convey MidTown Estates to the Trust, the petition asserted that (1) Saemann (being under guardianship) was not legally capable of transferring a tenancy-by-the-entirety property, and (2) the powers of the temporary guardian were limited and did not include the power to transfer such properties on Saemann's behalf.[5] The effect of the circuit court's ruling invalidating the conveyances was to make Irene Saemann the *sole* owner of these properties, including MidTown Estates. None of the other Trust beneficiaries objected to these proceedings.

### D. *AICPA Investigation & Disciplinary Proceedings*

As noted above, when HUD received a copy of Plummer's February 21, 1990 audit, the agency corresponded with Plummer over the summer of 1990 to inquire whether his dual role as auditor of Midtown Estates and co-trustee of the Saemann Trust amounted to a conflict of interest. Plummer's responses and explanations for the apparent conflict of interest were deemed unsatisfactory and in early 1991, HUD filed a complaint with the AICPA's Professional Ethics Division, alleging that Plummer had violated "accepted auditing standards" by conducting the audit of MidTown Estates while simultaneously serving as a co-trustee of the Trust, the owner of the property.[6]

---

**5.** In 1986 (i.e., at the time of the conveyance in question), the Indiana Code provided that "[a] temporary guardian ... has only the responsibilities and powers that are ordered by the court." Ind.Code § 29–3–3–4(c).

**6.** HUD also filed a complaint with state regulatory officials. The Consumer Protection Division of the Indiana Attorney General's Office investigated Plummer's conduct with respect to Mid-

The Professional Ethics Division of the AICPA investigates and prosecutes alleged violations of the AICPA Code. Upon a *prima facie* showing that a member has violated the Code, the Ethics Division refers the matter for a hearing before a panel of the AICPA's Joint Trial Board, which may impose a range of sanctions including expulsion and suspension from the organization. The Bylaws provide that "[n]otice of disciplinary action ... together with a statement of the reasons therefor, shall be published...." AICPA Bylaws (1990), § 7.6. The Ethics Division, after review, shared HUD's concern and referred the case for a hearing before a five-member panel of the AICPA Joint Trial Board. Plummer appeared with counsel and was given an opportunity to submit voluminous written materials and documentary evidence in his defense. The AICPA panel rendered a decision after the hearing, on May 10, 1994,[7] finding that Plummer had violated Rule 101 of the Code (conflict of interest) when he completed an audit of Midtown Estates while also serving as cotrustee of the Trust, the owner of record of the property. Plummer was censured, ordered to complete seven hours of continuing education courses in professional ethics, and informed that the Board's decision would be published in the AICPA's national newsletter. Upon Plummer's request, an ad hoc committee of the Joint Trial Board reviewed the entire record and on August 10, 1994 unanimously voted to deny Plummer's appeal.

### E. *District Court Proceedings*

Plummer filed suit in federal court on November 1, 1994, asking the court to declare the AICPA's disciplinary actions arbitrary, capricious, and contrary to state law, and also requesting that the court issue a permanent injunction barring the AICPA from

---

Town Estates and determined that Plummer had not violated any of the laws or regulations governing the practice of accounting in Indiana.

**7.** The panel's opinion, rendered orally at the close of the hearing, neither elaborated on the reasons for its decision nor commented on the evidence in the record.

publishing any information concerning its discipline of Plummer. The AICPA agreed not to publish the results of its disciplinary proceeding until the court had ruled on the permanent injunction. By order dated June 9, 1995, the trial court denied Plummer's request for declaratory relief, stating that the AICPA's decision was neither erroneous nor contrary to law and observing "[w]hether the AICPA's decision is correct as a matter of accountancy ethics is not an issue within this court's competence to decide." The trial judge also denied injunctive relief based on his finding that publication of the AICPA's disciplinary measures would not be defamatory under Indiana law.

## II. ISSUES

Plummer challenges the AICPA's disciplinary order on several grounds. Initially, Plummer asserts that the defendant's disciplinary actions are contrary to Indiana law. According to Plummer, the state court's invalidation of the conveyance of MidTown Estates to the Trust as "void ab initio" precludes any finding by the AICPA that Plummer violated the organization's conflict-of-interest rules. Plummer argues that because the Trust never legally owned the property, it was impossible for him to have a conflict of interest. Plummer further argues that even if the Trust *did* own the property at the time he provided the auditing services, the AICPA's disciplinary action was arbitrary and capricious because the Joint Trial Board ignored and disregarded evidence that he subjectively believed that Irene Saemann was the owner of the property. Finally, Plummer asserts that injunctive relief is necessary because he will have no adequate remedy at law (i.e., damages will be impossible to determine) if the AICPA is permitted to publish the disciplinary proceedings.

## III. DISCUSSION

### A. *The AICPA's Discipline & Indiana Property Law: The "Void Ab Initio" Argument*

As noted above, more than a year after Plummer submitted the results of his audit,

an Indiana state court, as part of the guardianship proceedings pertaining to Mr. Saemann, found the transfer of MidTown Estates to the Trust invalid because tenancy-by-the-entirety property may not be conveyed by a single tenant acting unilaterally. *In re Saemann*, No. G–86–12 (Kosciusko Cir. Ct. filed October 7, 1991). As a matter of law, the conveyance was thus "void ab initio," or void from the beginning. *Trook v. Lafayette Bank and Trust Co.*, 581 N.E.2d 941, 944 (Ind.App.1991) ("[T]he term ... means literally 'void from the beginning' and denotes an act or action that never had any legal existence at all because of some infirmity in the action or process."). We are not called upon to review the state court's ruling, and observe that the parties do not dispute its merits. See Cunningham et al., *The Law of Property* § 5.5, at 205–6 ("[T]enancies by the entirety are ... not destructible by the unilateral act of either spouse...."). According to Plummer, however, the state court's decision precludes any finding by the AICPA that he had a conflict of interest with respect to MidTown Estates. This "void ab initio" argument posits that the AICPA may not find Plummer guilty of an ethical violation because, technically speaking and unbeknownst to Plummer, the property did not belong to the Trust at the time of the audit but rather to Irene Saemann. Thus, Plummer asserts that as a matter of law, there could be no conflict between his role as cotrustee of the Trust and his role as auditor of MidTown Estates.

■ The appellant claims that the AICPA, by disregarding the decision of the state court and refusing to accept the "void ab initio" argument, is creating and enforcing "its own law of trusts." We reject Plummer's argument that the AICPA has somehow over-stepped its bounds, and we refuse to be distracted by the appellant's (inappropriate) focus on property-law issues. We are not called upon to decide any questions of property law in this appeal, but rather to determine whether Plummer may obtain a judicial remedy for discipline that he describes as "arbitrary and capricious." We emphasize that the AICPA has chosen to enforce its ethical rules against conflicts of

interest. By doing so, it has neither invaded the realm of the courts nor created "its own law of trusts," for obviously the AICPA and other private voluntary associations lack the authority and the jurisdiction to determine the legal status of real estate such as the MidTown Estates property. On the other hand, as the Supreme Court of Indiana has recognized in very clear terms, private voluntary associations do have a *"sacred right"* to make, interpret, and enforce rules governing the ethical conduct of their own members. *State ex rel. Givens v. Superior Court of Marion County,* 233 Ind. 235, 117 N.E.2d 553, 555 (1954) (emphasis added). Under Indiana law, voluntary associations "clearly have the right of self-preservation" and "implicit in that right is the power of an organization to [discipline] members who violate that organization's rules." *Terrell v. Palomino Horse Breeders of America,* 414 N.E.2d 332, 338 (Ind.App.1980).

■ The AICPA's Code of Conduct calls for member-accountants to be "independent in fact *and appearance* when providing auditing and other attestation services." (emphasis added). As we are confident that the plaintiff-appellant realizes, this "avoidance of the appearance of impropriety" standard measures ethical conduct against a criterion *stricter* than mere compliance with the law. Plummer does not contest that when he joined the AICPA (a voluntary association without licensing authority), he agreed to be bound by the organization's high ethical standards, as set forth in the AICPA Code, as well as the disciplinary rules and procedures outlined in the AICPA's Bylaws. *See The Supreme Lodge, Knights of Pythias v. Knight,* 117 Ind. 489, 20 N.E. 479 (1889) ("A person who enters an association must acquaint himself with its laws, for they contribute to the admeasurement of his rights, his duties and his liabilities."). It is rather obvious that the defendant bases his argument on a foundation of quicksand when he asserts that the propriety of his conduct should be measured in terms of a legal technicality that was decided by a court of law well after the audit took place (i.e., the state court's ruling that the transfer of MidTown Estates to the Trust was "void ab initio").

We agree with the trial court that the appellant Plummer's self-serving analysis of the legal status of the MidTown Estates property is not so much incorrect as it is misplaced and irrelevant. We reject Plummer's argument that the AICPA's disciplinary measures must be declared "contrary to law" because it is the prerogative of the AICPA to hold its members to an ethical standard *higher* than what the law requires, and Plummer himself agreed to be bound by such a standard when he joined the AICPA.

## B. *The AICPA's Discipline & Indiana's Law of Voluntary Associations*

In addition to the "void ab initio" or "contrary to law" argument analyzed heretofore, Plummer maintains that the AICPA's finding of a conflict of interest was "arbitrary and capricious" because it overlooked evidence that he subjectively believed that MidTown Estates belonged to Irene Saemann at the time he rendered auditing services. The status of the property in Plummer's mind, he asserts, was the same as the actual legal status of the property (even though, as discussed above, that status would not be determined by a court until a year and a half *after* the audit).

In addressing Plummer's "arbitrary and capricious" argument, initially we must consider the applicable standard of review, i.e., whether and to what extent Indiana law provides for judicial review of the disciplinary actions of private voluntary associations. The appellant, arguing for a broad scope of review, relies on this court's decision in *Crane v. Indiana High School Athletic Ass'n,* 975 F.2d 1315 (7th Cir.1992). In *Crane,* we explained recently, "a split panel of this court intervened in a decision of the Indiana High School Athletic Association ("IHSAA") and found that the association interpreted and applied its rules in an arbitrary and capricious manner when it denied varsity golf eligibility to a high school student who moved between his divorced parents." *Freeman v. Sports Car Club of America, Inc.,* 51 F.3d 1358, 1363 (7th Cir.1995) (summarizing *Crane*). The majority in *Crane* correctly noted the "longstanding, general principle of judicial noninterference

in the internal affairs of voluntary associations," 975 F.2d at 1319, but then observed, we think unnecessarily, that "exceptions ... virtually consume this general rule." *Id.* at 1320.

The dominant theme of the Indiana cases is, in fact, judicial reluctance to interfere with the disciplinary actions of private voluntary associations. Indiana's Supreme Court has declared that "[a] voluntary association may, without direction or interference by the courts, for its government, adopt a constitution, by-laws, rules and regulations which will control as to *all* questions of discipline, or internal policy and management, and its right to interpret and administer the same is as sacred as the right to make them." *Givens,* 117 N.E.2d at 555 (emphasis added). Therefore, "[a]s a general rule courts will not interfere to control the administration of the constitution and by-laws of such association, or to enforce rights springing therefrom." *Id.*

In light of *Givens,* the only precedent from Indiana's highest court, two questions arise: (1) "What are the exceptions to the 'general rule' of non-interference?" and (2) "Do they (as *Crane* asserts) 'virtually consume' the principle of non-interference by the courts?" *Givens* acknowledged only very limited exceptions, i.e., cases in which a member of a voluntary association has been deprived of a civil or property right. *Id. Crane,* however, cited two cases for the proposition that review is more expansive. The first of these cases is *Randolph v. Leeman,* 129 Ind.App. 134, 146 N.E.2d 267 (1957), an appellate decision issued several years after *Givens. Randolph* emphasized the general rule of non-interference but, in a departure from *Givens,* the *Randolph* court quoted a treatise which suggested that in addition to the denial of civil or property rights, "mistake, fraud, collusion, or arbitrariness" as well as the failure of an association to "proceed[ ] in accordance with its rules" might provide a basis for judicial review. 146 N.E.2d at 272 (quoting 4 Am.Jur § 17).

*Crane* also relied on a more recent Indiana appellate decision, *United States Auto Club v. Woodward,* 460 N.E.2d 1255 (Ind.App. 1984), which set forth the exceptions to the rule of judicial non-interference in separate and somewhat contradictory passages. In *Woodward,* the court initially stated that "a court should interfere only if it finds that the powers [of the voluntary association] were exercised in an unlawful, arbitrary or malicious fashion *and* in such a manner as to affect the property rights of one who complains." 460 N.E.2d at 1260–61 (quoting *STP Corp. v. United States Auto Club, Inc.,* 286 F.Supp. 146, 151 (S.D.Ind.1968)). Later, the *Woodward* court added a subtle twist, holding that "[a]bsent some violation of a property right, *or* proof that the rule was applied in an arbitrary, discriminatory, or malicious manner, we believe adherence to the principle of judicial non-interference is a wise course of action...." *Id.* at 1261. Obviously, the two statements concerning the scope of judicial review set forth in *Woodward* are quite different: the former is faithful to *Givens* because it links arbitrariness to the deprivation of a *property* right, while the latter allows more or less open-ended judicial review of an "arbitrary" decision, whether or not that decision deprived the complainant of an alleged property right. *Crane* relied upon the second and more permissive standard articulated in *Woodward,* unfortunately without providing a discussion, much less an explanation, of the aforementioned inconsistency in *Woodward.*

■ In the recent *Freeman* case, we revisited our decision in *Crane* and expressed skepticism that the majority opinion in *Crane* "correctly applied Indiana law in finding the IHSAA's decision reviewable *where no civil or property right was involved.*" 51 F.3d at 1363 (emphasis added). We also reaffirmed the principle that Indiana courts will interfere with the right of private voluntary associations to make and enforce their own disciplinary rules "only in very limited circumstances." *Id.* We also pointed out that the organization whose discipline was challenged in *Crane* (the IHSAA, an organization composed primarily of *public* schools) was a state actor and therefore subject to more stringent judicial review than a purely private voluntary association. *Id.* Thus, at a minimum, *Freeman* holds that *Crane* is distinguishable from the instant case, *which*

*does not involve state action. Freeman,* together with our review of the Indiana cases, also leads us to conclude that *Crane* may have overstated the proper scope of judicial review, under Indiana law, in cases involving the disciplinary actions of private voluntary associations. The scope of that review is limited; indeed, we are convinced that the law of Indiana only permits judicial review of allegedly "arbitrary" discipline in situations where a member of a private voluntary association has been denied a civil or property right. *Givens,* 117 N.E.2d at 555.

We pay heed to the principle enunciated by the Indiana Supreme Court in *Givens* that a voluntary association may "without direction or interference by the courts," adopt and enforce its own rules. Indiana law is clear that the courts may not interfere with the enforcement of such rules unless the complainant can demonstrate a federal or state constitutional violation or is able to show that he has been deprived of a civil or property right, which is not the case here. The record reflects that the AICPA was both careful and deliberate before it embarked upon the serious step of imposing discipline in Plummer's case, acting only after a full panoply of hearings. The AICPA has also agreed to delay publication of its disciplinary findings during the pendency of this litigation. Even if the Trial Board's disciplinary findings are published in the AICPA's national newsletter, as proposed, Plummer will not be denied a property or a civil right. Under Indiana law, membership in a private association (the AICPA) neither amounts to nor creates a civil or property right, but rather is a "privilege." *Givens,* 117 N.E.2d at 555. Thus, even if the AICPA were to expel or suspend Plummer, such an action would not deprive the appellant of anything that the law recognizes as a property or civil right. If expelled or suspended, Plummer could still practice the accounting profession, but would not be able to advertise membership in the AICPA or take advantage of the benefits associated with membership in that organization. Because Plummer's case falls into neither of the exceptions delineated in *Givens* (discussed *supra*), under Indiana law the courts (including this court) are not empowered to review the AICPA's findings or

provide a remedy in the form of declaratory relief.

We refuse to accept Plummer's premise that Indiana law provides for judicial review of disciplinary decisions, such as the one before us, which involve neither a state or federal constitutional violation nor the deprivation of property or civil rights. Moreover, even if we agreed with the appellant concerning the proper scope of judicial review, we would still affirm the district court's denial of relief because there is substantial evidence in the record that Plummer was aware of a conflict at the time he agreed to carry out the audit of MidTown Estates and when he submitted the results of his audit. In addition to the obvious lack of judgment on Plummer's part, we have Plummer's letter to Irene Saemann and his letters to HUD and his various and sundry excuses, all of which demonstrate that the appellant was certainly aware of a conflict of interest, one which he attempted to cure by recusing himself from Trust transactions involving MidTown Estates. Plummer's August 22, 1990 letter to HUD is particularly harmful to his case, for it undermines his claim that he honestly believed Irene Saemann to be the owner of MidTown Estates (a claim that is crucial in light of our rejection, *supra*, of Plummer's legalistic "void ab initio" argument). In that letter, written six months after the audit was submitted, Plummer candidly admitted that "*two weeks ago* it came to light that MidTown Estates is actually owned by Irene Saemann and not the ... Trust." *In mid-August of 1990*, therefore, by his own admission, Plummer first became aware of a potential legal flaw in the 1986 conveyance of MidTown Estates to the Trust, and for the first time started making the "void ab initio" argument in defense of his actions (the Kosciusko, Indiana County Circuit Court ruled definitively that the transfer was "void ab initio" one year later). If the information about the ownership status of the property did not "come to light" until the summer of 1990, then Plummer is obviously being less than truthful when he asserts, as he did before the AICPA, that he considered Saemann to be the owner at the time he performed the audit in February of 1990 (six

months earlier). In light of the evidence in the record, including the documentary evidence which is so clearly at odds with Plummer's account, we refuse to hold that the AICPA's discipline of Plummer was unreasonable, much less "arbitrary and capricious." [8]

When Plummer's case is analyzed in contractual terms,[9] we can only conclude that the AICPA's discipline did not contravene the mutual understanding of the parties and thus did not amount to a breach of contract. Upon joining a voluntary organization, members agree to be bound by the organization's ethical rules and its disciplinary procedures, as set forth in documents such as the AICPA Code of Conduct and the AICPA Bylaws respectively. The organization, by promulgating such rules and procedures, obviously represents that it will abide by them as well. However, the disciplinary rules and procedures adopted by a private voluntary organization need not be as formal or as elaborate as those employed in a court of law, and it is not surprising that the AICPA Bylaws are silent concerning the quantum of evidence or proof required for a finding of ethical misconduct. The AICPA outlined certain disciplinary procedures in its Bylaws (which the organization followed in Plummer's case) but it made no representations to any of its members, including the plaintiff-appellant, about the *substantive* standards governing discipline of members. Therefore, we agree with the AICPA that it did not breach any contractual obligations to Plummer when it found him guilty of an ethical violation.

### C. *Plummer's Request for Injunctive Relief*

Plummer asserts that the trial court erroneously denied his request for injunctive relief and that a permanent injunction is necessary to prevent the AICPA from publishing its disciplinary findings in its national newsletter. "When we review the grant or denial of a . . . permanent injunction . . . factual determinations are reviewed under a clearly erroneous standard and the necessary legal conclusions are given *de novo* review." *United States v. Kaun*, 827 F.2d 1144, 1148 (7th Cir.1987).

A court must consider four traditional criteria in deciding whether to grant injunctive relief: (1) whether the plaintiff has a reasonable likelihood of success on the merits; (2) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; (3) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; and (4) whether the granting of the injunction will harm the public interest. *N.L.R.B. v. Electro–Voice, Inc.*, 83 F.3d 1559, 1567 (7th Cir.1996); *Faheem–El v. Klincar*, 841 F.2d 712, 716 (7th Cir.1988). A permanent injunction (as opposed to a preliminary injunction or a temporary restraining order) is not provisional in nature, but rather is a final judgment. *Walgreen Co. v. Sara Creek Property Co.*, 966 F.2d 273, 275 (7th Cir.1992). Thus, when the plaintiff is seeking a permanent injunction, the first of the four traditional factors is slightly modified, for the issue is not whether the plaintiff has demonstrated a reasonable *likelihood* of success on the merits, but whether he has *in fact* succeeded on the merits. *See Amoco v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987).

In his brief before this court, Plummer discusses but one of the four factors outlined above: the alleged inadequacy of damages as a remedy. According to Plummer, damages are inadequate in this case because, "given the national scope of the proposed publication of the AICPA's arbitrary and capricious determination of . . . ethical violations, it would be difficult, if not

---

**8.** Black's Law Dictionary (6th Ed.1990) states that a decision is "arbitrary and capricious" when it is "willful and unreasonable" and "without consideration or in disregard of facts or law or without determining principle."

**9.** Plummer has not asserted a breach of contract claim and therefore, strictly speaking, we need not engage in contractual analysis. We do so, not to equate the standard of review with breach of contract (as the appellee advocates), but to demonstrate that no matter how the standard of review is conceptualized, Plummer has failed to persuade us that the AICPA's discipline merits a judicial remedy.

impossible, to accurately calculate ... [such] damages." The appellant fails to address (or even mention) the remaining three prerequisites for granting a permanent injunction, including the fundamental requirement that "the plaintiff must have succeeded *on the merits* of [his] claim." *Ced's Inc. v. E.P.A.*, 745 F.2d 1092, 1100 (7th Cir.1984) (emphasis added); *see also* 11A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2941 (1995). As discussed above, Plummer has *not* succeeded on the merits of his claim that the AICPA's disciplinary actions were "arbitrary, capricious, and contrary to Indiana law." Therefore, as the trial judge properly found, Plummer is not entitled to a permanent injunction barring publication of the AICPA's disciplinary findings.

## IV. CONCLUSION

We reject Plummer's contention that the AICPA is barred from disciplining him for engaging in conduct that gave the appearance of impropriety because of the state court's after-the-fact ruling on the ownership status of MidTown Estates. We also hold that the AICPA's disciplinary actions do not trigger judicial review under Indiana's law of voluntary associations, which is based on a strong presumption of judicial non-interference. The AICPA's actions deprive Plummer of neither civil nor property rights and thus do not fall within the only exceptions to the general rule of judicial non-interference recognized by the state of Indiana through the pronouncements of its Supreme Court. Furthermore, even if judicial review of the AICPA's disciplinary proceedings were proper under Indiana law, we would still deny declaratory relief, for the AICPA's disciplinary action was based upon overwhelming evidence of Plummer's unethical conduct. Because Plummer has failed on the merits of his claim, we agree with the trial judge that he is not entitled to a permanent injunction. The *district court is*

AFFIRMED.